**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALICIA ANGUS, | ) | CASE NO. 4:25-CV-01858-JDA |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| v. | ) | ARMSTRONG |
| | ) | |
| FRANK BISIGNANO, | ) | **MEMORANDUM OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.     INTRODUCTION

Plaintiff Alicia Angus ("Ms. Angus") seeks judicial review of the final decision of the

Commissioner of Social Security denying her application for Social Security disability insurance

benefits ("DIB"). The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. §

636(c) and Federal Rule of Civil Procedure 73. (ECF No. 6). For the reasons set forth below, the

Commissioner's final decision is REVERSED and this matter is REMANDED to the

Commissioner for further proceedings consistent with this opinion.

## II.     PROCEDURAL HISTORY

On July 28, 2022, Ms. Angus filed her application for DIB, alleging an onset date of

September 9, 2021. (Tr. 258). Ms. Angus' application related to her systemic lupus erythematosus,

rheumatoid arthritis, fibromyalgia, vertigo, migraines, high blood pressure, and peripheral edema.

(Tr. 300).

The Social Security Administration ("SSA") denied Ms. Angus' application initially and

upon reconsideration. (Tr. 134, 142). Ms. Angus requested a hearing before an administrative law

1

judge ("ALJ"). (Tr. 174). The ALJ held a hearing on July 3, 2024, at which Ms. Angus was represented by counsel. (Tr. 62). Ms. Angus testified, as did an independent vocational expert ("VE"). On July 26, 2024, the ALJ issued a written decision, finding that Ms. Angus was not disabled. (Tr. 36). The ALJ's decision became final on July 9, 2025, when the Appeals Council declined further review. (Tr. 8).

On September 6, 2025, Ms. Angus filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Angus asserts the following assignments of error:

(1)     Whether the ALJ erred in evaluating Plaintiff's fibromyalgia under Social Security Ruling 12-2p.

(2)     Whether the ALJ properly evaluated Plaintiff's migraines under Social Security Ruling 19-4p.

(ECF No. 9, PageID # 1311).

### III.     BACKGROUND[1]

#### A.     <u>Personal, Educational, and Vocational Experience</u>

Ms. Angus was born in 1975 and was 46 years old on the alleged onset date. (Tr. 258). She is divorced and has no minor children. (Tr. 73-74, 258-59). She lives with her boyfriend. (Tr. 73). Ms. Angus attended high school through the 11th grade. (Tr. 301). She has prior work experience as a cashier and an ophthalmic technician. *Id*.

#### B.     <u>Relevant Hearing Testimony</u>

##### *1.     Ms. Angus' Testimony*

Ms. Angus testified that, on a typical day, she experiences pain in the lower half of her body and her left arm. (Tr. 79). She testified that the pain lasts all day but varies in intensity. *Id*. She also testified that her typical pain is a seven-and-a-half out of ten with medication. *Id*. Without

---

[1] The ALJ found that Ms. Angus suffered from both physical and mental impairments. In this proceeding, Ms. Angus challenges only the ALJ's evaluation of her fibromyalgia and migraines. Accordingly, The Court will limit its discussion to evidence regarding those impairments.

medication, her pain is a nine-and-a-half to ten out of ten. *Id*. She also testified that her condition has deteriorated over the last couple of years, and that her pain, vision, and ability to focus have gotten worse. (Tr. 82).

Ms. Angus testified that she suffers from both flare-ups and migraines, and that she cannot predict when either will occur. (Tr. 78). She testified that her neurologist believes her migraines and vertigo are associated with her lupus, and that migraine medication does not help. (Tr. 78-79). She also testified that she is in excruciating pain that feels like sharp needles, and that it also affects her vision and her ability to stand. (Tr. 79). She further testified that she stretches throughout the day and attempts to do some exercise even though it hurts. (Tr. 80-81). She testified that stretching helps to alleviate some of the pain. (Tr. 83).

With respect to her headaches, Ms. Angus testified that she gets a migraine at least once per month. (Tr. 84). She testified that each migraine lasts a minimum of three days, and that her migraines last five days on average. *Id*. She also testified that she has flare-ups once per month for approximately ten days, during which she experiences nausea and vomiting from migraines and has difficulty concentrating and walking. (Tr. 85).

Ms. Angus testified that she is able to sit comfortably for approximately five minutes, stand for a few minutes, walk less than a quarter of a mile, and lift up to five pounds. (Tr. 80). She also testified that she has difficulty remembering to perform self-care. *Id*. Ms. Angus further testified that she can perform some chores around the house, but that she needs to take a break after five minutes and that her boyfriend does 90 percent of the chores. (Tr. 81-82).

### 2. *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical individual with Ms. Angus' age, education, and work history who was limited to light work and could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel,

crouch, or crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; could understand, remember, and carry out simple instructions and use judgment to make simple work-related decisions; could never perform work at a production rate pace; could deal with occasional changes in a routine work setting; and could interact with supervisors and coworkers and occasionally interact with the public. (Tr. 92). The VE testified that the hypothetical individual could not perform Ms. Angus' past work but could perform jobs existing in significant numbers in the national economy, including work as a housekeeper; inspector, hand packager; or office helper. (Tr. 92-93).

The ALJ next asked the VE to consider a hypothetical individual who was limited to sedentary work and could occasionally reach overhead; frequently reach in all other directions; frequently handle and finger; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to extreme heat; could understand, remember, and carry out simple instructions; could use judgment to make simple work-related decisions; could never perform work at a production rate pace; could deal with occasional changes in a routine work setting; and could interact frequently with supervisors and coworkers and occasionally interact with the public. (Tr. 93-94). The VE testified that the hypothetical individual could perform work as a document preparer, touch-up screener, or final assembly. (Tr. 94).

The VE also testified that it would be work-preclusive if the individual would be off-task 20 percent of the day or more and/or absent from work two days per month. (Tr. 95). In response to a question from Ms. Angus' counsel, the VE further testified that the individual from the ALJ's first hypothetical could not perform work as an inspector, hand packager if the individual could only sit, stand, or walk for 30 minutes at a time, but that the individual would be able to perform

work as an office helper or housekeeper. (Tr. 95-96). The VE also testified that the hypothetical individual could not perform those jobs if the individual was limited to occasional reaching in all directions. (Tr. 96). The VE further testified that it would be work-preclusive if the individual needed two additional 15-minute breaks per day to lie down. *Id*.

### C. Relevant Opinion Evidence

#### 1. State Agency Medical Consultants

On September 29, 2022, W. Scott Bolz, M.D., a state agency medical consultant, opined that Ms. Angus could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, and could stand or walk and/or sit for approximately six hours in an eight-hour workday. (Tr. 139). Dr. Bolz also opined that Ms. Angus could never climb ladders, ramps, or scaffolds; occasionally climb ramps or stairs; and frequently balance, stoop, kneel, crouch, or crawl. *Id*. Dr. Bolz further opined that Ms. Angus should avoid all exposure to hazards. *Id*. On July 13, 2023, Murari Bijpuria, M.D., concurred with Dr. Bolz's findings on reconsideration. (Tr. 150).

#### 2. Annabelle Morales-Mena, M.D.

On February 22, 2022, Dr. Morales-Mena, Ms. Angus' rheumatologist, completed an attending physician's statement to The Hartford, an insurer, in connection with Ms. Angus' long-term disability claim. (Tr. 570). Dr. Morales-Mena opined that Ms. Angus was unable to stand, sit, or walk for more than 30 minutes at a time. (Tr. 571). Dr. Morales-Mena further opined that Ms. Angus could never drive, climb, squat, or kneel; occasionally bear weight, bend, engage in fine or gross manipulation; and occasionally reach above or below her shoulders. *Id*. Dr. Morales-Mena also opined that Ms. Angus could occasionally lift or carry fewer than 10 pounds and could never lift or carry more than 10 pounds. *Id*.

Dr. Morales-Mena submitted another disability form to The Hartford on October 3, 2022. (Tr. 659). Dr. Morales-Mena listed Ms. Angus' fibromyalgia as a co-morbid condition that impacted her diagnosis. *Id*. Dr. Morales-Mena opined that Ms. Angus could sit, stand, or walk for

fewer than 30 minutes at a time and for fewer than four total hours in a workday. (Tr. 660). Dr. Morales-Mena also opined that Ms. Angus could never bear weight, climb, squat or kneel, and could occasionally drive, bend, engage in fine or gross manipulation, and reach above or below her shoulder. *Id*. Dr. Morales-Mena further opined that Ms. Angus could frequently lift or carry fewer than five pounds and could occasionally lift or carry up to 12 pounds. *Id*.

The ALJ found that Dr. Morales-Mena's February 22, 2022 opinion was not persuasive because it was inconsistent with Ms. Agnus' physical examinations or her own statements about her activity levels. (Tr. 46-47). The ALJ also found that Dr. Morales-Mena's October 3, 2022 opinion was not persuasive because Dr. Morales-Mena did not provide support for the sit, stand, or walk limitations and because her opinion was not consistent with Ms. Angus' physical examinations or course of treatment. (Tr. 47).

### 3.     *Kristen Smith, M.D.*

On January 24, 2023, Dr. Smith, Ms. Angus' neurologist, completed a physician's statement to The Hartford. (Tr. 719). Dr. Smith opined that Ms. Angus could sit continuously with standard breaks and could intermittently stand, sit, or walk with standard breaks. *Id*. Dr. Smith further opined that Ms. Angus could continuously drive and could occasionally bear weight, climb, bend, squat, kneel, engage in fine or gross manipulation, and reach above or below her shoulder. *Id*.

The ALJ found that Dr. Smith's opinion regarding Ms. Angus' ability to sit, stand, or walk was persuasive. (Tr. 48). However, the ALJ also found that Dr. Smith's opinion regarding Ms. Angus' ability to engage in reaching or fine or gross manipulation was not persuasive because Dr. Smith did not provide any explanation in support of those limitations. *Id*.

### 4.     *Michael Majetich, D.O.*

On February 13, 2023, Dr. Majetich completed a physician's statement to The Hartford. (Tr. 720). Dr. Majetich echoed the limitations identified by Dr. Morales-Mena in her October 3,

2022 report and included a notation that those limitations were "determined by [Ms. Angus'] rheumatologist." *Id*. The ALJ found that Dr. Majetich's opinion appeared to be an adoption of Dr. Morales-Mena's October 3, 2022 opinion and was not persuasive for the same reasons as that opinion. (Tr. 48-49). The ALJ also found that Dr. Majetich's opinion was inconsistent with his own treatment notes. (Tr. 49).

### D.     Relevant Medical Evidence

On September 20, 2021, Ms. Angus presented to Dr. Morales-Mena for continuing care of her systemic lupus erythematosus, arthritis, and fibromyalgia. (Tr. 630). Dr. Morales-Mena noted that Ms. Angus had complained of symptoms for at least 10 years, including low-grade fevers, extreme fatigue, migraines, nausea, vomiting, vision loss, and difficulty walking. *Id*. Dr. Morales-Mena stated that Ms. Angus had a complicated medical history with multiple issues. (Tr. 638). Dr. Morales-Mena also noted that Ms. Angus was on Plaquenil, which was partially effective. *Id*. Dr. Morales-Mena stated that Ms. Angus likely had mixed connective tissue disorder. *Id*. She was started on Depomedrol. *Id*.

On September 22, 2021, Ms. Angus presented to Tracy Schmidt, APRN, complaining of dizziness and headaches, which she said had been getting worse over the past two weeks. (Tr. 843). She said that her dizziness improved at night and returned in the morning. *Id*. She also reported that she was experiencing severe headaches two to three times per week, that the headaches were frontal, and that she experienced photophobia, phonophobia, nausea, and blurred vision. *Id*. She said that she was taking butalbital three times per week, which helped to reduce the headaches. *Id*. She also reported that she was experiencing a flareup of her lupus and rheumatoid arthritis. *Id*. She said that she was on a leave of absence from work. *Id*. On examination, Ms. Angus was negative for numbness, tingling, muscle weakness, blurred vision, muscle pain, and joint problems. *Id*. She also displayed normal muscle bulk and tone, motor strength, and reflexes. (Tr.

844). Nurse Schmidt stated that Ms. Angus was likely experiencing a medication overuse headache, but ordered a brain MRI. (Tr. 844-45). Ms. Angus was instructed to abstain from over-the-counter medication for two weeks to see if that helped her headaches. (Tr. 844).

Ms. Angus had a follow-up visit with Dr. Morales-Mena on November 24, 2021. (Tr. 625). Ms. Angus reported problems with imbalance and difficulty walking. *Id*. Dr. Morales-Mena also noted that Ms. Angus was still awaiting insurance approval for biologic injections. *Id*.

On November 30, 2021, Ms. Angus had a follow-up appointment with Dr. Smith. (Tr. 840). She reported getting horrible headaches once per week, but said that medication helped. *Id*. Dr. Smith noted that Ms. Agnus' processing was slow and that she struggled to answer questions in detail. *Id*. Dr. Smith stated that Ms. Angus struck her as likely intoxicated. *Id*.

On December 16, 2021, Ms. Angus went to the emergency department after her roommate found her on the floor displaying seizure-like activity. (Tr. 456). Ms. Angus reported that she was currently on medical leave from her job at Home Depot. (Tr. 457). She was admitted for observation and testing. (Tr. 456). Physical and neurological examinations were largely normal, and a CT scan of her brain was negative. (Tr. 458-59, 463). It was noted that the etiology of her seizure-like activity was unclear. (Tr. 537).

Ms. Angus had another follow-up visit with Dr. Morales-Mena on February 15, 2022. (Tr, 617). Ms. Angus reported brain fog and memory issues; numbness, tingling, and shooting pain in her left wrist to her fingers; pain and a limited range of motion in her left shoulder; spinal pain; and foot and ankle pain, worse in her left foot than her right. (Tr. 618). On examination, Ms. Angus was positive for polysynovitis. *Id*. Dr. Morales-Mena also noted that Ms. Angus continued to experience joint pain, swelling, stiffness, back pain, and weakness of the legs, feet, and hands, all of which appeared to be worsening. *Id*. Dr. Morales-Mena further noted that Ms. Angus' insurer had denied authorization for Orencia injections. *Id*.

On February 22, 2022, Ms. Angus saw Dr. Smith. (Tr. 838). She reported experiencing cognitive problems since her seizure, including difficulties with her short-term memory, problem solving, processing, and attention. *Id*. Dr. Smith noted that Ms. Angus experienced migraines without aura and without status migrainosus, which were not intractable. *Id*. A neurological examination was normal, and Ms. Angus displayed normal motor strength, muscle bulk and tone, and reflexes. (Tr. 839). Dr. Smith noted that Ms. Angus' headaches were manageable and advised her to exercise daily. (Tr. 838).

Ms. Angus had a follow-up visit with Dr. Smith on April 28, 2022. (Tr. 834). Ms. Angus reported that she recently began taking Orencia for rheumatoid arthritis, that she was doing well, and that she was not experiencing headaches. *Id*. She also reported receiving Toradol injections. *Id*. She said that she was walking two to six miles at least four times per week. (Tr. 834). A physical examination was normal. (Tr. 835).

Ms. Angus saw Dr. Morales-Mena again on March 22, 2022. (Tr. 613). Ms. Angus reported that she had begun taking Wellbutrin and that she had a pending EEG and EMG for left arm numbness and tingling. (Tr. 614). A review of symptoms was positive for fever, drenching sweats, fatigue, scalp tenderness, dysuria, joint pain, swelling, stiffness, back pain, weakness in her legs and arm, numbness, and tingling. *Id*. Ms. Angus received a Toradol injection. *Id*. Dr. Morales-Mena also noted that Ms. Angus had been approved for Orencia and was beginning infusions. *Id*.

Ms. Angus received an Orencia infusion on April 14, 2022. (Tr. 609). At the time of the injection, she reported pain in her entire body, which she rated as an eight out of ten. *Id*. Ms. Angus received another infusion on May 26, 2022, at which she rated her lower back pain as an eight out of ten. (Tr. 605).

Ms. Angus had a follow-up visit with Dr. Smith on April 28, 2022. (Tr. 700). Ms. Angus reported that she was doing well and was not experiencing headaches. *Id*. She also reported that

9

she was walking between two and six miles on most days. *Id*.

Ms. Angus received another Orencia infusion on August 1, 2022. (Tr. 597). She reported pain in her knees, feet, and ankles, which she rated as a six-and-a-half out of ten. *Id*. She also reported difficulties performing activities of daily living. *Id*.

Ms. Angus had a follow-up visit with Dr. Smith on November 16, 2022. (Tr. 832). Ms. Angus reported that she was struggling with intense migraines at least once per week for the past two months. (Tr. 832-33). She also reported daily pain from lupus, rheumatoid arthritis, and fibromyalgia. (Tr. 832). Her medications were adjusted. *Id*.

On January 16, 2023, Ms. Angus saw Dr. Majetich for follow-up on low potassium levels. (Tr. 675). During the visit, Ms. Angus stated that she needed paperwork filled out for her disability application and that she did not believe she could return to work at Home Depot in light of her polyarthralgias and fibromyalgia. (Tr. 675-76). On examination, Ms. Angus displayed bilateral nonpitting edema in her legs with a normal range of motion and tenderness to palpitation over her paraspinal/posterior muscles on the left side. (Tr. 677).

Ms. Angus had a pain management appointment with Henry Vucetic, M.D. on January 26, 2023. (Tr. 758). She reported constant pain in her neck. (Tr. 759). On examination, Ms. Angus displayed a normal gait and full strength in her extremities. *Id*. She was diagnosed with degenerative disc disease, cervical radiculopathy, failed back syndrome of the lumbar spine, other chronic pain, and cervical spinal stenosis. (Tr. 759-60). Dr. Vucetic noted that Ms. Angus was unable to attend physical therapy and referred her for a functional capacity examination. (Tr. 760).

Ms. Angus had a neurology appointment with Dr. Smith on May 4, 2023. (Tr. 826). She reported that her headaches were getting worse and that she had experienced at least one migraine per week over the past month, along with a headache every day. *Id*. She attributed her headaches to the changing weather, tension, and stress. *Id*. She also reported that her headaches were

manageable if she caught them in time, but that her migraines were debilitating. *Id*. Her medications were adjusted to add Propranolol and to increase her dose of Wellbutrin. (Tr. 827).

Ms. Angus had a rheumatology appointment with Li Sun, PA-C on July 26, 2023. (Tr. 902). Ms. Sun noted that, while one lupus-related antibody was positive, all other lab results were negative, indicating that Ms. Angus did not have active lupus. (Tr. 904). Instead, Ms. Sun stated that Ms. Angus' symptoms may result from fibromyalgia and lumbar spine degenerative changes. *Id*.

On August 18, 2023, Ms. Angus had an initial pain management consultation with Sarah Rogers, M.D, at which she complained of generalized body pain that she had experienced for approximately 20 years. (Tr. 896, 898). After an examination, Dr. Rogers concluded that Ms. Angus satisfied the American College of Rheumatology criteria for fibromyalgia. (Tr. 900). Dr. Rogers discussed management options with Ms. Angus, including medication adjustment, exercise, relaxation therapy, stress management, acupuncture, tai chi, and yoga. *Id*. She was prescribed diclofenac, Robaxin, and trigger point injections, and was referred to aqua therapy. *Id*.

On August 25, 2023, Ms. Angus went to the Cleveland Clinic's urgent care facility, complaining of a headache that had lasted for two days, along with a urinary tract infection, lower back pain, odor, night sweats, and burning. (Tr. 893). Ms. Angus reported that her headache was persistent since onset, and included some vertigo, nausea, and light sensitivity. *Id*. She said that it felt like her usual migraine and that her migraine medication had been ineffective. *Id*. She received an injection of ketorolac. (Tr. 895).

Ms. Angus had a follow-up appointment with Dr. Smith on November 9, 2023. (Tr. 1276). Ms. Angus reported that she was using medical marijuana, which helped with her pain and sleep. (Tr. 1277). A physical examination was normal. *Id*. Ms. Angus had another neurology appointment on May 20, 2024. (Tr. 1272). She reported experiencing tactile and visual hallucinations. *Id*. An

11

examination was normal. (Tr. 1273).

On May 8, 2024, Ms. Angus had a follow-up visit with Dr. Morales-Mena. (Tr. 1244). Ms. Angus reported tenderness and swelling in her thumbs, knees, and ankles. (Tr. 1245). Dr. Morales-Mena listed Ms. Angus' diagnoses as lupus, connective tissue disease, and polyarthritis. (Tr. 1252-53). She noted that Ms. Angus was not doing well despite adherence to treatment and adjusted her medication. (Tr. 1253).

On May 20, 2024, Ms. Angus had another appointment with Dr. Smith. (Tr. 1272). She reported that she began taking azathioprine during a recent jail sentence. *Id*. She also reported that she started hallucinating several weeks later and had a migraine for three months. *Id*. She said that her tactile hallucinations were gone and that her visual hallucinations were somewhat better. *Id*. However, she also reported that her audible hallucinations were persistent. *Id*.

Ms. Angus underwent a functional capacity examination on June 19, 2024. (Tr. 1284). The examiner noted that Ms. Angus' responses to a pain questionnaire indicated a high level of pain that was frequently associated with individuals who are amplifying their pain or disability. *Id*. The examiner also noted that Ms. Angus failed one of the objective tests for validity during the physical evaluation process. *Id*. As a result, the test was invalid, and the examiner could not determine Ms. Angus' maximum functional ability. *Id*.

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Angus met the insured status requirements of the Social Security Act through December 31, 2026. (Tr. 41). The ALJ next determined that Ms. Angus had not engaged in substantial gainful activity since September 9, 2021, the alleged onset date. *Id*. The ALJ further determined that Ms. Angus had the following severe impairments: degenerative changes, postsurgical changes, and disc disease of the lumbar spine/failed back syndrome; degenerative changes and disc disease, mostly at C5-6 and C6-7, with spinal canal and bilateral

foraminal stenosis and with mild chronic C6 and/or C7 radiculopathy in the left; fibromyalgia; systemic lupus erythematosus/rheumatoid arthritis/polyarthritis; essential hypertension; migraines; depression; anxiety; and panic disorder. (Tr. 41-42). However, the ALJ also determined that none of Ms. Angus' severe impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I. (Tr. 42).

The ALJ next determined that Ms. Angus had the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally reach overhead with the right and the left; frequently reach in all other directions with the right and the left; frequently handle with the right and the left; frequently finger with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to extreme heat; has the ability to understand, remember, and carry out simple instructions; able to use her judgment to make simple work-related decisions; cannot perform work requiring a specific production rate (i.e. assembly line work); able to deal with occasional changes in a routine work setting; and able to frequently interact with supervisors and coworkers and occasionally interact with the public.

(Tr. 44).

The ALJ further determined that Ms. Angus was unable to perform her past relevant work. (Tr. 54). The ALJ determined, however, that jobs existed in significant numbers in the national economy that Ms. Angus could perform, including work as a touch up screener, final assembler, and electronics assembler. (Tr. 54-55). Accordingly, the ALJ found that Ms. Angus was not disabled. (Tr. 55).

## V.    LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

13

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996))

14

(alteration in original).

### B.     Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the

15

claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g) and 404.1560(c). *See Abbott*, 905 F.2d at 923.

### C. Analysis

#### 1. The ALJ's Evaluation of Ms. Angus' Fibromyalgia

Ms. Angus first argues that the ALJ erred in evaluating her fibromyalgia under Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (July 25, 2012). SSR 12-2p provides that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations" that prevent a person from performing a full range of unskilled work. *Id.* at *6. SSR 12-2p also says that people with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." *Id.*

In addition, SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. It provides that, once the ALJ determines that a claimant has a medically determinable impairment of fibromyalgia, the ALJ must proceed to evaluate fibromyalgia under the traditional five-step review process. *Id.* at *5. In doing so, the ALJ must also evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. *Id.* First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* SSR 12-2p also provides that, given the distinct characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.

Importantly, although "the same factors are applied to fibromyalgia as to any [medically determinable impairment], caselaw demonstrates that [t]he nature of fibromyalgia undercuts the

16

efficacy of many of these factors and muddies the legal analysis." *James v. Comm'r of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 4172932, at *14 (N.D. Ohio June 5, 2023) (quotations omitted). That is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Id.* (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). Instead of focusing on indications like muscle strength and range of motion, the process of diagnosing fibromyalgia "includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id.* at 244.

As the Sixth Circuit has recognized, "in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Id.* at 245. Moreover, because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.* No. 1:21-CV-01309-SO, 2022 WL 3567412, at *10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022).

Ms. Angus argues that the ALJ violated SSR 12-2p both because the ALJ did not adequately consider whether her fibromyalgia medically equaled a listing at Step Three and because the ALJ did not incorporate restrictions based on her fibromyalgia into the RFC and did not sufficiently explain his failure to do so. The Court will consider Ms. Angus' arguments in turn.

17

a. _Step Three_

At Step Three, the ALJ must consider whether a claimant's severe impairment meets or medically equals the requirement for a listing. 20 C.F.R. § 404.1520(d). "An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." _Reynolds v. Comm'r of Soc. Sec._, 424 F. Appx. 411, 415 (6th. Cir. 2011). If the impairment meets or equals a listing and satisfies the durational requirement, the ALJ must find that the claimant is disabled. _See Smith-Johnson v. Comm'r of Soc. Sec._, 579 F. Appx. 426, 431 (6th Cir. 2014). However, the claimant must exhibit all elements of the listing; it is not sufficient that a claimant come close to meeting the requirements of a listing. _See Elam v. Comm'r of Soc. Sec._, 348 F.3d 124, 125 (6th Cir. 2003). It is the claimant's burden at Step Three to prove that an impairment medically equals a listing. _See Lusk v. Comm'r of Soc. Sec._, 106 F. App'x 405, 411 (6th Cir. 2004). To meet that burden, a claimant must "present medical evidence which describes how the impairment has such equivalency." _Thacker v. Soc. Sec. Admin._, 93 F. App'x 725, 728 (6th Cir. 2004).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" _Smith-Johnson_, 579 F. Appx. at 432 (quoting _Sheeks v. Comm'r of Soc. Sec._, 544 F. App'x 639, 641 (6th Cir. 2013)). Instead, an ALJ should discuss a listing "where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." _Id._ (quoting _Abbott v. Sullivan_, 905 F.2d 918, 925 (6th Cir. 1990)).

There is no listing for fibromyalgia, and Ms. Angus' fibromyalgia thus cannot meet a listing. Instead, Ms. Angus must show that her fibromyalgia medically equals a listing, such as Listing 14.09D, which SSR 12-2p references. _See_ SSR 12-2p, 2012 WL 3104869, at *6

("[F]ibromyalgia] cannot meet a listing in appendix 1 because [fibromyalgia] is not a listed impairment. At step 3, therefore, we determine whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment").

Ms. Angus argues that remand is required because the ALJ wholly failed to analyze whether her fibromyalgia medically equaled a listing. The Court agrees. Indeed, while the ALJ analyzed various listings in detail at Step Three, the ALJ did not mention Listing 14.09D or any other listing in connection with Ms. Angus' fibromyalgia. (Tr. 42-43). Instead, the ALJ said only that he "considered SSR 12-2p regarding the Evaluation of Fibromyalgia." (Tr. 43). However, the ALJ did not explain *how* he evaluated Ms. Angus' fibromyalgia under SSR 12-2p, whether that analysis included consideration of Listing 14.09D or another listing, and, if so, why the ALJ believed that Ms. Angus' fibromyalgia did not medically equal the listing.

The ALJ's failure to cite a listing and to meaningfully analyze whether Ms. Angus' fibromyalgia medically equals a listing "frustrates this Court's review." *Lowe v. Comm'r of Soc. Sec.*, No. 1:25-cv-00826-RJS, 2025 WL 3204739, at *9 (N.D. Ohio Nov. 17, 2025); *see also Cirino v. Comm'r of Soc. Sec.*, No. 1:23-CV-01379-PAG, 2024 WL 1558169, at *14 (N.D. Ohio Mar. 22, 2024), *report and recommendation adopted*, 2024 WL 1555773 (N.D. Ohio Apr. 10, 2024) (holding that "broad and vague statement" that "[t]he Listings have threshold requirements that are not met in the instant case" was not sufficient to provide medical equivalency analysis for fibromyalgia); *Rodway v. Comm'r of Soc. Sec.*, No. 1:18CV0169, 2019 WL 540871, at *7 (N.D. Ohio Jan. 24, 2019), *report and recommendation adopted*, 2019 WL 527782 (N.D. Ohio Feb. 11, 2019) (holding that ALJ erred in failing to analyze whether fibromyalgia medically equaled listing).

It is true that a reviewing court reads the ALJ's decision as a whole to determine whether

19

the ALJ adequately addressed medical equivalency elsewhere. *See Lybarger v. Comm'r of Soc. Sec.*, No. 3:24-cv-1013, 2024 WL 5134290, at *15 (N.D. Ohio Dec. 17, 2024), *report and recommendation adopted*, 2025 WL 959463 (N.D. Ohio Mar. 31, 2025) ("Legal authority instructs that the balance of the ALJ's decision must supply the rationale for the ALJ's medical equivalence finding."). Here, however, the ALJ did not provide a sufficient explanation elsewhere in the decision. The ALJ noted in several places that Ms. Angus was diagnosed with fibromyalgia and that she was positive for trigger points. (Tr. 45-46, 49-50). Outside of those brief mentions, the ALJ did not meaningly analyze Ms. Angus' fibromyalgia in a manner that would supplement a medical equivalency analysis at Step Three. The ALJ's brief discussion of Ms. Angus' fibromyalgia elsewhere in the decision thus does not remedy the ALJ's Step Three failure. *See Rodway*, 2019 WL 540871, at *7 ("Although the Commissioner contends that 'the ALJ provided an extensive summary of Plaintiff's treatment history,' which the Commissioner claims demonstrates that Rodway's fibromyalgia would fail to medically equal a Listing, the ALJ's decision did not include that analysis or reach that specific conclusion.") (internal citation omitted).

The Commissioner defends the ALJ's Step Three analysis by supplying reasoning that the ALJ did not. The Commissioner asserts that the ALJ "stat[ed] in conclusory manner that he, 'also considered SSR 12-2p regarding the Evaluation of Fibromyalgia,' and determined that Plaintiff's fibromyalgia did not medically equal any listing." (ECF No. 10, PageID # 1340). However, the ALJ did not actually say anywhere in the decision that he determined Ms. Angus' fibromyalgia did not medically a listing. While it is possible that the ALJ's discussion was intended to imply that conclusion, the ALJ's decision is too vague and conclusory for the Court to trace the ALJ's reasoning.

The Commissioner next argues that the Court should reject Ms. Angus' Step Three

20

argument because she has not shown that she actually medically equaled Listing 14.09D or any other listing and because she did not provide an opinion from any medical source regarding medical equivalence. As another court in this district held in analogous circumstances, however, "the Commissioner's argument in this regard mistakes [Ms. Angus'] argument." *Lowe*, 2025 WL 3204739, at *9. Ms. Angus "does not argue that her fibromyalgia impairment meets any listing" but rather that the ALJ failed to follow SSR 12-2p. Thus, "the central question . . . is not whether fibromyalgia meets Listing 14.09D . . . but the ALJ's failure to follow SSR 12-2p . . . ." *Id*.

The Commissioner further argues that Ms. Angus cannot show that her fibromyalgia medically equaled a listing because the state agency medical consultants opined that she did not meet or medically equal any listing. The Commissioner's argument is not well-taken for two reasons. First, the state agency medical consultants did not actually consider whether Ms. Angus' fibromyalgia medically equaled Listing 14.09D. Instead, they considered whether her systemic lupus erythematosus met or medically equaled Listing 14.02. (Tr. 138, 148). Regardless, the ALJ did not rely on the state agency medical consultants to conclude that Ms. Angus' fibromyalgia did not medically equal a listing, and a reviewing Court cannot rely on post hoc rationalizations to justify the ALJ's decision. *See Hawker v. Comm'r of Soc. Sec.*, No. 1:25-cv-920, 2025 WL 2711418, at *5 (N.D. Ohio Sept. 23, 2025) (noting that post hoc rationalizing "is not permitted"); *Renfrow v. Comm'r of Soc. Sec. Admin.*, No. 3:24-CV-00946-JJH, 2024 WL 5158962, at *10 (N.D. Ohio Dec. 18, 2024), *report and recommendation adopted*, 2025 WL 959528 (N.D. Ohio Mar. 31, 2025) ("while the Commissioner offers an explanation for that determination, the ALJ did not include such an explanation in the decision; therefore, this constitutes impermissible *post-hoc* rationalization"). Remand is required in light of the ALJ's failure to evaluate whether Ms. Angus' fibromyalgia medically equaled a listing.

21

b. _RFC_

Even assuming that the ALJ's analysis was sufficient at Step Three, the Court agrees with Ms. Angus that the ALJ erred in failing to properly consider her fibromyalgia when formulating her RFC. "A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." _Golden v. Berryhill_, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), _report and recommendation adopted sub nom_, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." _Rudd v. Comm'r of Soc. Sec._, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which [the ALJ] is relying, and [the ALJ] may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." _Golden_, 2018 WL 7079506 at *17 (quoting _Fleischer_, 774 F. Supp. 2d at 880). However, "[i]t is plaintiff's burden to prove the severity of her impairments, and to provide evidence establishing her RFC." _Lumpkin v. Comm'r of Soc. Sec._, No. 1:20-CV-1849, 2021 WL 4987607, at *3 (N.D. Ohio Oct. 27, 2021).

As noted above, the ALJ briefly mentioned Ms. Angus' fibromyalgia in several places in the decision. The ALJ first noted that Ms. Angus was diagnosed with fibromyalgia in 2018. (Tr. 45). The ALJ next noted that, at a September 22, 2021 visit, Ms. Angus' medical history included fibromyalgia and other conditions. (Tr. 46). The ALJ also noted that Ms. Angus told Dr. Majetich that she was unable to return to her job at Home Depot because standing on concrete floors caused her polyarthralgia and fibromyalgia symptoms to flare up. (Tr. 49). Finally, the ALJ noted that Dr. Rogers diagnosed Ms. Angus with fibromyalgia on August 18, 2023, prescribed her Robaxin and Diclofenac as needed for pain, and recommended exercise and aqua therapy. (Tr. 50).

In none of these instances, however, did the ALJ actually analyze Ms. Angus' fibromyalgia

22

or explain what impact the condition had on the RFC. Moreover, the ALJ's surrounding discussion demonstrates that, if the ALJ was intending to analyze Ms. Angus' fibromyalgia rather than merely summarizing evidence, the ALJ erred. As noted above, the Sixth Circuit has held that opinions focusing solely on objective evidence are not particularly relevant to fibromyalgia given the unique nature of the condition. *Rogers*, 486 F.3d at 244. However, the ALJ's discussion focused heavily on objective symptoms, noted that Ms. Angus presented with a normal gait, coordination, strength, and sensation, other than some tenderness and mild swelling. (Tr. 45-46, 50).

To the extent the ALJ cited those objective findings as evidence that Ms. Angus' fibromyalgia was less serious than she claimed, the ALJ misconstrued the nature of the condition and failed to apply proper legal standards. *See Hardman v. Berryhill*, No. 5:16CV2795, 2018 WL 1545707, at *17 (N.D. Ohio Mar. 5, 2018), *report and recommendation adopted sub nom.*, 2018 WL 1536743 (N.D. Ohio Mar. 29, 2018) ("Had the ALJ only relied upon the relatively benign clinical findings, an issue would arise concerning . . . his RFC determination because fibromyalgia is not amenable to objective diagnosis and standard clinical tests are not highly relevant in diagnosing or assessing fibromyalgia or its severity.") (quotation omitted); *Jones v. Comm'r of Soc. Sec.*, No. 1:21-CV-01309-SO, 2022 WL 3567412, at *12 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022) (recommending remand where ALJ rejected fibromyalgia diagnosis on the basis of objective medical evidence).

That is not to say that Ms. Angus is necessarily disabled. As the Sixth Circuit has held, "a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . ." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008); *see also Sarchet*, 78 F.3d at 307 ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority.") (citations omitted). However, the ALJ's decision does not provide a sufficient discussion of Ms.

23

Angus' fibromyalgia for the Court to determine how the ALJ considered that condition and incorporated it into Ms. Angus' RFC. Accordingly, Ms. Angus' first assignment of error has merit with respect to both the ALJ's Step Three and RFC determinations, and the Court remands the case to the Commissioner for further consideration of Ms. Angus' fibromyalgia.

### 2. *The ALJ's Evaluation of Ms. Angus' Migraines*

Ms. Angus also argues that the ALJ erred in evaluating her migraine headaches because the ALJ did not follow the relevant Social Security Ruling, SSR 19-4p, either at Step Three or when formulating her RFC. Ms. Angus' arguments are not well-taken.

### a. *Step Three*

The SSA has promulgated SSR 19-4p to "explain [Agency] policy on how we establish that a person has a[ ] [medically determinable impairment] of a primary headache disorder and how we evaluate primary headache disorders in disability claims." SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). For Step Three, SSR 19-4p states in relevant part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[ ] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[ ]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary

24

> headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).
>
> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p, 2019 2019 WL 4169635 at *7.

Unlike Ms. Angus' fibromyalgia, the ALJ expressly addressed her headaches and Listing 11.02 in the ALJ's Step Three analysis, stating that he "considered the claimant's physical impairments under the requirements of Listing 11.02, but there is no evidence of headaches occurring at the required frequency, despite adherence to prescribed treatment." (Tr. 42). Ms. Angus disputes the ALJ's conclusion that there was no evidence showing she had headaches at the required frequency. However, her argument fails at a threshold step, as she has not provided the evidence that Social Security regulations require before an ALJ can make a medical equivalency finding.

The SSA has promulgated SSR 17-2p to explain how it will determine whether a claimant's impairment medically equals a listing. SSR 17-2p, 2017 WL 3928306 (Mar. 27, 2017). SSR 17-2p provides that, for the ALJ to conclude that a claimant medically equals a listing, the record must contain:

1. A prior administrative medical finding from a [state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding; or

2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding; or

25

3. A report from the [Appeals Council's] medical support staff supporting the medical equivalence finding.

*Id*. at *3. "Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert." *Willis v. Comm'r of Soc. Sec.*, No. 5:25-CV-01503-DCN, 2025 WL 2055270, at *13 (N.D. Ohio July 23, 2025), *report and recommendation adopted*, 2025 WL 2402706 (N.D. Ohio Aug. 19, 2025); *see also Weese v. Comm'r of Soc. Sec.*, No. 1:22-CV-2215, 2024 WL 4213314, at *23 (N.D. Ohio Sept. 17, 2024). And, if the ALJ believes the evidence does not reasonably support a medical equivalence finding, the ALJ is not required to obtain medical expert evidence and also is not required to "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." SSR 17-2p, 2017 WL 3928306, at *4.

Ms. Angus does not contend that the record contains any of the three forms of evidence that SSR 17-2p requires. As a result, "the ALJ's no-medical-equivalency finding was consistent with the record, and the ALJ wasn't required at step three to articulate [his] reasons for finding so." *Lybarger*, 2024 WL 5134290, at *14; *see also Weese*, 2024 WL 4213314, at *23 ("because [the ALJ] believed the evidence did not support a medical equivalence finding, he was not required to articulate specific evidence supporting his . . . finding that Ms. Weese's impairments did not medically equal Listing 11.02").

### b. RFC

Ms. Angus also argues that the ALJ erred because the ALJ did not incorporate sufficient restrictions resulting from her migraines into Ms. Angus' RFC. Unlike Ms. Angus' fibromyalgia, however, the ALJ discussed and analyzed the evidence regarding Ms. Angus' migraines. The ALJ noted Ms. Angus' testimony that she experiences at least one migraine a month, which lasts for approximately five days. (Tr. 45). The ALJ also cited to treatment notes showing that Ms. Angus

26

was experiencing severe daily or weekly headaches, that her headaches worsened at times, that her headaches were "horrendous" and caused her pain for days without relief, and that she experienced hallucinations while in jail. (Tr. 46-51). However, the ALJ also noted that Ms. Angus reported medication helped with her headaches, that her headaches were "manageable," and that the frequency of her headaches decreased at points. *Id*. Considering all the evidence, the ALJ concluded that the RFC properly accounted for Ms. Angus' limitations. (Tr. 51-52). Reviewing the decision as a whole, the Court cannot say that the ALJ's decision is unsupported by substantial evidence.

Ms. Angus cites to evidence that she believes should have led the ALJ to adopt a more restrictive RFC. However, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision"). Substantial evidence supports the ALJ's conclusion with respect to Ms. Angus' migraines, and Ms. Angus' second assignment of error is not well-taken.

## VI.   CONCLUSION

For the foregoing reasons, the Court REVERSES the Commissioner's final decision denying Ms. Angus' application for Social Security disability insurance benefits and REMANDS this matter to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: July 20, 2026

/s *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge